**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Martin SKLAROFF, Reuben Goldstein,**
**and Pearl Leppo, a/k/a Earl Leppo,**
**Defendants-Appellants.**

No. 75–2116.

United States Court of Appeals,
Fifth Circuit.

May 27, 1977.

Rehearing and Rehearing En Banc
Denied June 30, 1977.

---

James J. Hogan, Joseph Mincberg, Miami Beach, Fla., for Sklaroff.

Stephen Stein, Douglas G. Crosby, Las Vegas, Nev., for Goldstein.

Martin K. Leppo, Richard H. Gens, Boston, Mass., for defendants-appellants.

Robert W. Rust, U. S. Atty., U. S. Dept. of Justice, Martin L. Steinberg, Sp. Atty., Miami, Fla., Marc Philip Richman, Atty., Dept. of Justice, Jerome M. Feit, T. George Gilinsky, Washington, D. C., for plaintiff-appellee.

Before MORGAN, CLARK and TJOFLAT, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Defendants Sklaroff,[1] Goldstein and Leppo were charged in a nine count indictment in the United States District Court for the Southern District of Florida with violating 18 U.S.C. § 1952[2] through the use of interstate telephones to promote, facilitate, or carry on unlawful gambling activity contrary to the laws of Florida and of the United States. The Government introduced evidence to establish that between June 13, 1973 and July 8, 1973, the defendants made interstate telephone calls to carry on unlawful gambling activity. That is, Reuben Goldstein, operating out of Las Vegas, often called Martin Sklaroff, a Miami bookmaker and gave him "line information," or the odds, on various professional baseball games. Typically, several minutes after Goldstein's call, Earl Leppo, a bookmaker operating in the Boston area, called Sklaroff, received the line information, and then placed substantial bets with Sklaroff. In

---

1. Defendant Martin Sklaroff having died while this appeal was pending, his appeal has been dismissed.

2. 18 U.S.C. § 1952 reads as follows:

    (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
    (1) distribute the proceeds of any unlawful activity; or
    (2) commit any crime of violence to further any unlawful activity; or
    (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

    (b) As used in this section 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which committed or of the United States.

    (c) Investigations of violations under this section involving liquor or narcotics shall be conducted under the supervision of the Secretary of the Treasury.

addition to FBI surveillance and identification testimony, testimony of three of Sklaroff's gambler-customers, testimony of an FBI expert on bookmaking, telephone records, and bookmaking paraphernalia and records seized from the defendants pursuant to a search warrant, the Government's evidence included tapes of conversations between Goldstein and Sklaroff and between Leppo and Sklaroff. These tapes were the product of electronic surveillance of four Sklaroff telephones in the Miami area. Authorized by Judge Roettger of the United States District Court of Florida pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2520, the first surveillance was conducted between June 11 and June 13, 1973. Agents halted the interception on June 13 when they learned that Sklaroff was switching his operations to a different location and to different telephones. After receiving a second application, supported by an affidavit from Marilu Marshall, a special attorney with the Miami Strike Force, Judge Roettger issued another order authorizing the interception of wire communications of "Martin Sklaroff, Reuben Goldstein and others, as yet unknown" for a second fifteen day period. Agents then conducted interceptions of two phones used by Sklaroff in Miami, beginning the electronic surveillance on June 28, 1973 and terminating it on July 9.

■ Defendants' primary contentions of error deal with alleged deficiencies in the application for an interception order that the task force attorney submitted to Judge

Roettger. First, they argue that the failure of the task force to identify Earl Leppo in either of their applications violated 18 U.S.C. § 2518(1)(b)(iv),[3] which requires that each application identify all known persons who are committing the offense and whose communications are to be intercepted. Appellants argue that Department of Justice attorneys had probable cause to believe that Earl Leppo was committing the offenses under investigation and violated § 2518(1)(b)(iv) by not listing him on their applications. In *United States v. Doolittle*, 507 F.2d 1368, aff'd *en banc*, 518 F.2d 500 (5th Cir. 1975), *cert. denied* 423 U.S. 1008, 96 S.Ct. 439, 46 L.Ed.2d 380 (1977) we upheld the admission of evidence from a wiretap against several defendants whom the Government allegedly had probable cause to believe would be involved in the ongoing criminal activity, but who were not named in the wiretap application, on the ground that the defendants had not demonstrated any prejudice in not being named in the application and that defendants had presented no evidence of Governmental bad faith. In a recent holding, however, the Supreme Court had held that while Title III requires the Government to name on its wiretap application any person whom it has probable cause to believe is engaged in the criminal activity under question, failure to meet this requirement does not require suppression of the evidence produced.[4] *U. S. v. Donovan*, —— U.S. ——, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Therefore, according to *Donovan*, even assuming that Leppo was a "known person" who should have been

3. 18 U.S.C. § 2518(1)(b)(iv) states:

(1) Each application for an order authorizing the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

.   .   .   .   .

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

4. While the opinion in *Donovan* apparently rejects that part of our holding that made a showing of prejudice a ground for suppressing a wiretap based on an application that did not name all "known persons," it did not decide whether proof of Governmental bad faith in not disclosing all such persons would justify suppression. *See United States v. Donovan*, —— U.S. —— at ——, 97 S.Ct. 658 at 672, 50 L.Ed.2d 652, at 673 n.23 (1977). Because appellants do not allege or show such bad faith, we do not have to decide that question in this case.

named in the application, the Government's failure to do this does not require suppression of the evidence obtained against him.

■ Appellant Goldstein argues that the application did not comply with either § 2518(1)(c) or § 2518(1)(e) and that, as a result, evidence obtained through electronic surveillance made pursuant to those deficient applications should be suppressed. 18 U.S.C. § 2518(1)(c) provides that applications for wire interceptions include:

> [a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

Appellant contends that the Government's attempt to comply with this requirement was inadequate in that affidavits submitted for this purpose were conclusory and did not provide sufficient facts from which a detached judge could determine whether alternate, viable investigative procedures existed. In support of his argument, appellant Goldstein cites *United States v. Kalustian*, 529 F.2d 585 (9th Cir. 1975), in which the Ninth Circuit held that affidavits that rely on conclusory allegations and boilerplate language to show the unavailability of other investigative techniques are insufficient to meet the standard set forth in § 2518(1)(c). Yet, this court has held that § 2518(1)(c) "must be read in a common sense fashion." *United States v. Robertson*, 504 F.2d 289 (5th Cir. 1974), *cert. denied* 421 U.S. 913, 95 S.Ct. 1568, 43 L.Ed.2d 778. Accordingly, the purpose of the statute "is not to foreclose electronic surveillance until every other imaginable method of investigation [has] been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Pacheco*, 489 F.2d 554, 565 (5th Cir. 1974). *Kalustian* notwithstanding, this court has recently examined an affidavit containing the same allegations that appellant argues in this case are inadequate and ruled that it complies with § 2518(1)(c). Thus, in *United States v. McCoy*, 539 F.2d 1050 (5th Cir. 1976), we held that in order to uphold a

wiretap order, the affidavit must only supply a "factual predicate" adequate to support the judge's implicit finding that "[the] 'investigative procedures appear unlikely to succeed.'" *Id.* at 1055–56. In that case, the panel held to be an adequate factual predicate an affidavit stating that based on the FBI agent's experience in investigating gambling offenses and on the fact that searches of gamblers usually failed to prove all the elements of federal offenses, particularly with respect to participants not present at the searched premises, that gamblers often do not keep permanent records, that temporary records are often destroyed during a search and are often in a code that is difficult to decipher, that FBI informants would be unwilling to testify, and that physical surveillance would jeopardize the investigation, electronic surveillance was necessary. The allegations contained in the affidavit under attack in this case being almost identical to those approved in *McCoy*, we likewise hold that the application in question complied with § 2518(1)(c).

■ In his final attack on the adequacy of the application for a wiretap order, appellant Goldstein argues that the Government did not comply with 18 U.S.C. § 2518(1)(e), which requires each application to contain

> a full and complete statement of the facts concerning *all previous applications* known to the individual authorizing and making the application made to any judge for authorization to intercept, or for approval of interruptions of wire or oral communications *involving any of the same persons, facilities or places specified in the application*, and the action taken by the judge on each such application.

(Emphasis added). In its application to intercept communications of Sklaroff and Goldstein, the Government listed three previous applications for wire interceptions of Sklaroff and Goldstein, two for the former and one for the latter. Appellant Goldstein contends, however, that it failed to mention one wiretap application in which he was involved and that this non-compliance with § 2518(1)(e) mandates suppression of the

tapes obtained pursuant to Judge Roettger's two orders. Specifically, Goldstein alleges that the Government did not inform Judge Roettger that Goldstein's conversations were overheard on a 1971 interception authorized by the United States District Court for the Eastern District of Tennessee. Goldstein concedes that he was not a target of the application, itself, in that the application was directed at "James Alexander Clark, a/k/a "Butterball," David R. Thomas, a/k/a "Ross Thomas," and others as yet unknown." Rather, he argues that because the affidavit submitted in support of the application discussed some of his gambling activities with Clark and Thomas, this application should have been brought to Judge Roettger's attention. Several courts, including this one, have held that an application to intercept conversations of a particular individual does not have to reveal a prior interception of that individual's conversations when that person was not the target of the application seeking the prior interception. *See United States v. Florea*, 541 F.2d 568 (6th Cir. 1976); *United States v. Kilgore*, 518 F.2d 496 (5th Cir. 1975), reh. denied, 524 F.2d 957, cert. denied, —— U.S. ——, 97 S.Ct. 1173 (1977). *United States v. Bellosi*, 163 U.S.App.D.C. 273, 51 L.Ed.2d 581, 501 F.2d 833, 839 n. 13 (1974); *United States v. O'Neill*, 497 F.2d 1020 (6th Cir. 1974); *United States v. Chiarizio*, 388 F.Supp. 858 (D.Conn.1975). In other words, if the Government submits an application to intercept the calls of John Doe and during their surveillance of him record conversations with Jane Roe, a subsequent application to intercept Jane Roe's calls does not have to refer to the John Doe application to satisfy § 2518(1)(c). Here, appellant argues that discussion of his gambling activities in an affidavit supporting a Title III application made him a target of that application and rendered that application subject to § 2518(1)(c). We disagree. An affidavit is submitted to justify an interception order by furnishing evidence of the Government's probable cause to believe that the named targets of the application are engaging in illegal gambling activities. In an effort to establish probable cause to conduct surveil-lance of the named individuals, the affidavit might discuss the activity of numerous people not named as targets of the investigation. It does not follow, however, that anyone listed in the affidavit is thereby deemed a target of the investigation subject to the dictates of § 2518(1)(c). We also find appellant's reliance on *United States v. Bellosi*, 163 U.S.App. D.C. 273, 501 F.2d 833 (1974), to be misplaced. In *Bellosi*, the District of Columbia Court of Appeals held that the Government violated § 2518(1)(c) when it purposely did not disclose in its applications that one of the intended targets had also been a target of an earlier application. Here, Goldstein was not a target of the Tennessee application. Likewise, the Government listed three prior interception applications directed at Sklaroff and Goldstein, so that no inference that it was trying to hide any previous interceptions is justified. In short, we hold that § 2518(1)(c) requires disclosure of only those previous *applications* directed at the person for whom the subsequent application is made.

■■ Appellants also contend that the attorney who presented the case to the grand jury—Martin Steinberg, a special attorney with the United States Department of Justice—was not *specifically directed*, within the meaning of 28 U.S.C. § 515(a), to present this indictment against defendants and that the indictment must therefore be dismissed. Section 515(a) states:

The Attorney General or any other officer of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrates, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

The Department of Justice hired Steinberg as an attorney on June 12, 1972 and the Assistant Attorney General for the Crimi-

nal Division, Henry Petersen, appointed him to the Miami Strike Force on November 30, 1972 with the following directive:

> to assist in the trial of [violation of federal criminal statutes by persons whose identities are unknown] in the Southern District of Florida and other judicial districts in the United States in which the Government is interested. In that connection you are specially authorized and directed . . . to conduct . . . any kind of legal proceedings . . . including grand jury proceedings . . which United States attorneys are authorized to conduct.[5]

Appellants contend that Steinberg's commission did not "specifically direct" him to appear before the grand jury pursuant to 28 U.S.C. § 515(a). This argument has been rejected in all circuits that have considered it. *See United States v. Prueitt*, 540 F.2d 995 (9th Cir. 1976); *Infelice v. United States*, 528 F.2d 204 (7th Cir. 1975); *In Re Grand Jury Subpoena of Persico*, 522 F.2d 41 (2nd Cir. 1975); *United States v. Wrigley*, 520 F.2d 362 (8th Cir. 1975), *cert. denied*, 423 U.S. 987, 96 S.Ct. 396, 46 L.Ed.2d 304. In *United States v. Wrigley*, 520 F.2d 362 (9th Cir. 1975), the Ninth Circuit, rejecting the defendant's argument that a letter of appointment identical to the letter being attacked in this case was too broad and failed to give specific direction in the grant of authority, held that the statute does not limit the employment of special attorneys to particular types of cases identified as unusually important or requiring particular expertise; the statute is a grant of authority, not a limitation. *Id.* at 364–68. We concur and hold that the letter of appointment for special attorney Steinberg complied with § 515(a).

Finally, appellant Leppo argues that the trial judge should have granted a mistrial when a Government witness commented on his silence at the time of his arrest after he had been given his Miranda warnings. At trial, to lay the foundation for evidence seized from Leppo, agent Jansen, who executed the search warrant, testified:

> I executed a search warrant to his person, and he was advised of his rights according to the Advice of Rights form.[6]

Defense counsel for Sklaroff, Mr. Hogan, objected:

> Your Honor, I object. Whether he was advised of his rights is immaterial. It violates his rights under the Fifth Amendment of the United States in implying that he had a duty to speak. The Government has not provided us with statements of any witnesses and therefore I would object to this line of questioning.[7]

The judge overruled his objection and at that moment the witness, spontaneously replying to defense counsel's remarks, stated, "Mr. Leppo declined to make any statement."[8] Defense counsel immediately objected to the witness' remark and the trial judge sustained their objections, instructing the jury that a defendant has an absolute right not to say anything during his arrest or trial. After he denied counsel's motion for a mistrial, the judge again instructed the jury to disregard the witness' statement. Likewise, in his final instructions to the jury, without making a direct reference to the incident, he stated that a defendant does not have to introduce any evidence or prove his innocence.

The Supreme Court has held in *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that the due process clause forbids the prosecution from using evidence of a defendant's post-arrest, post-Miranda warning silence either for substantive or impeachment purposes. In two cases announced since *Doyle*, this court has found an infraction of the *Doyle* rule, but has also held that violation to constitute only harmless error. Thus, noting that the prosecutor did not "focus on" or "highlight" defendant's silence in his cross-examination and closing remarks and that the prosecu-

---

5. R., Vol. III, p. 789.

6. R., Vol. VII, p. 408.

7. R., Vol. VII, p. 409.

8. *Id.*

tor's comments did not strike at the "jugular" of the defendant's story this court held to be harmless error the prosecution's elicitation of the defendant's silence during his arrest. *United States v. Davis*, 546 F.2d 583 (5th Cir. 1977). Likewise, in *Chapman v. United States*, 547 F.2d 1240 (5th Cir. 1977), a panel of this court held another prosecutorial question on the defendant's post-Miranda warning silence to be harmless error, noting that "when there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error." *Id.* at p. 1250. That standard was met here, for in this case there was only one reference to the defendant's silence and that reference was neither made nor elicited by the prosecution, but instead resulted from a spontaneous remark made by the witness. The prosecution never again mentioned the witness' comment and the judge adequately instructed the jury to disregard the comment. Further, no circumstance in Leppo's case gave rise to any expectation that Leppo, if innocent, would have made a statement at the time of his arrest, for his silence did not contradict any exculpatory story made in his defense, since indeed no such story was told.[9] In short, the fact of his post-Miranda warning silence was irrelevant to the issues presented at trial.

We have examined defendant Leppo's other contentions of error [10] and, finding them to be without merit, we affirm both defendants' convictions.

---

9. Leppo's defense regarding the Government's evidence against him went only to its sufficiency; his defense involved no exculpatory story that a post-Miranda silence would negate.

10. Leppo's other allegations of error include: the court's failure to sever the Leppo count from the Goldstein count, the court's issuance of an over broad instruction, the Government's withholding of favorable evidence from Leppo, and his conviction upon insufficient evidence.